# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 29, 2025

## STATE OF TENNESSEE v. JIMMY HAROLD CLARK

**Appeal from the Criminal Court for Cumberland County**
**No. CC20CR230    Wesley Thomas Bray, Judge**

_____

## No. E2025-00131-CCA-R3-CD

_____

Defendant, Jimmy Harold Clark, was convicted by a Cumberland County jury of one count of rape of a child under the age of thirteen.  The jury imposed the maximum fine of $50,000, and the trial court imposed a forty-year sentence to be served in confinement.  On appeal, Defendant argues that the trial court erred by denying the motion to suppress his statement and that his sentence was excessive.  Upon our review of the entire record, the briefs of the parties, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Craig P. Fickling, District Public Defender (on appeal), and Michael Giaimo (at trial), Cookeville, Tennessee, for the appellant, Jimmy Harold Clark.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Dugan, Assistant Attorney General; Bryant Dunaway, District Attorney General; and Philip Hatch, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

*Suppression Hearing*

Detective David Bowman, an investigator in the Special Investigations Unit of the Cumberland County Sheriff's Office ("CCSO"), testified that he was assigned to speak with the victim, H.N.,[1] a minor and possible victim of sexual abuse by Defendant, her step-grandfather. Detective Bowman and H.N. met at a "neutral location" and she explained "what had happened to her from the time she was younger until around the age of fifteen." Detective Bowman testified that the victim had taken out an order of protection against Defendant, and Defendant was asked to report to the sheriff's office to be served with the warrant. While Defendant was there on September 17, 2020, Detective Bowman asked to speak with him, and he agreed. Detective Bowman advised Defendant of his *Miranda*[2] rights, and Defendant's statement was both audio and video recorded. Investigator Tom Howard was also present. Concerning the *Miranda* waiver, Detective Bowman testified:

> Whenever I went through the *Miranda* with [Defendant], I took the sheet that we have that is standard for the Sheriff's Office. It has the *Miranda* Warning on it. I went line by line through the *Miranda* Warning with [Defendant]. As I finished the first line, I explained what that meant to [Defendant] and if he understood it. That's how I did the *Miranda* for every line of the *Miranda* and that's how I do with all the individuals that I interview.

(*Emphasis added*). Detective Bowman said that Defendant did not ask any questions or express any concerns about the waiver and signed it. He also initialed a section indicating that he had been *Mirandized*, that he could leave, and that he could have legal representation. Detective Bowman noted that the conversation with Defendant was amicable, and "[n]o one raised their voices, no one was ill at each other."

Defendant told Detective Bowman that he had been previously arrested for domestic assault in the early to mid-1980s. At the time of the interview, Defendant had been employed by Flower's Bakery for thirty-two years. He completed high school and indicated that he had no health or mental health problems, and he had not used alcohol or drugs in the prior twenty-four hours. Defendant also said he was not on any prescription medication, and he slept five hours the prior night. Detective Bowman testified that

---

[1] It is the policy of this court to refer to minors by their initials in order to protect their identity.

[2] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (holding any statement made by the accused during a custodial interrogation without the benefit of procedural safeguards is inadmissible in court).

Defendant's behavior and interactions suggested that his responses were true and accurate. The interview lasted approximately one to one and a half hours. Defendant was free to leave at the conclusion of the interview.

The transcript of the interview reflects that Detective Bowman read Defendant his *Miranda* rights and asked him to initial the waiver indicating that Detective Bowman advised him of those rights. The following exchange then took place:

[Defendant]: (Reads waiver.) When it says, "I don't want a lawyer at this time," until I know what it's about . . .

[Detective] Bowman: What that's saying is, that I have read you your rights, and that you understand them. And would you still like to talk to us, or you don't want to talk to us at all? And if you do want to talk to us, then we'll continue with our interview.

[Defendant]: I just don't know what this is about.

[Detective] Bowman: Well, before we get into that, I've got to have you do all of this.

[Defendant]: (Hands back waiver.)

[Detective] Bowman: Do you still want to speak with us?

[Defendant]: I'll speak with you. I don't know what it's about.

[Detective] Bowman: Okay. I'm going to go ahead and put the date, time, and the place on there. It is 16:00 hours. We do military time. So that's what we're used to here. 1/17/2020.

Okay. If you would, just initial that you did read that and you understood it, and then sign right there.

Defendant then signed the waiver, along with Detective Bowman, and Detective Howard signed as a witness.

Initially, Defendant claimed that years earlier, he woke up once with his hand touching H.N. "between her butt, down in there," meaning her vagina. He noted that H.N. and the other grandchildren would "crawl in the bed" with him when he worked second shift. Defendant agreed that H.N. had called him the day before the interview and that the call had been recorded. When H.N. said during the call that Defendant took her virginity,

- 3 -

Defendant replied: "I'm sorry about everything that happened." During the interview, he claimed that he did not understand what H.N. meant.

Defendant eventually admitted that the sexual abuse started when he "rubbed" H.N. He later digitally penetrated her. He claimed, "I thought it was what she wanted me to do." He said that this happened more than once when she was seven or eight years old. Defendant did not know if he took H.N.'s virginity, and he could not remember how old she was the first time he had intercourse with her but thought that she was thirteen or fourteen years old.[3] Defendant did not recall the last time that he had sex with H.N. She was sixteen or seventeen when she went to live with her other grandmother.

Defendant estimated that he had sexual intercourse with the victim three or four times. He said, "It happened, you know." Defendant further admitted that he rubbed H.N. or digitally penetrated her "maybe five" times or "something like that." He said that H.N. rubbed his penis, but he did not force her to do so. Defendant claimed that H.N. initiated some of the sexual contact by pushing her bottom up against his front. He would then reach around and rub her breasts and vagina. He agreed that he "just let it happen" but "it wasn't always on me." Defendant did not recall whether H.N. bled the first time they had sexual intercourse, and he did not show her any pornography. He agreed that some of the sexual contact occurred in the backyard while he and H.N. were camping but it did not occur every time they went camping.

Defendant said that he had talked to H.N. before the recorded phone call and apologized to her for what happened. He said, "I never meant for it to go like it went. I told her that." He said that his wife did not know what had occurred, and he had not touched any other underage girls. During the interview, Defendant made a drawing of his hand indicating that he penetrated the victim to approximately the first knuckle of his middle finger.

Detective Bowman testified that Defendant was not promised any leniency during the interview. He noted that Defendant was very cooperative and was there of his own volition. Detective Bowman had no concerns during the interview as to whether Defendant was under the influence of drugs or alcohol or whether he was mentally unstable. At the conclusion of the interview, Defendant's statement was reduced to writing. Detective Bowman testified that many of H.N.'s statements were corroborated by Defendant.

The trial court noted that it considered the proof presented at the suppression hearing, "the law cited by both sides, and the Motion to Suppress and the state's response, and the consideration of Exhibits 1 through 8[.]" The court also reviewed the transcript of the interview and concluded that Defendant "did issue a knowing and voluntary waiver of

---

[3] Detective Bowman noted there was some discrepancy as to when Defendant first had intercourse with H.N. and believed that she was between the ages of eight and ten.

his *Miranda* rights." The court further pointed out that all statements were given after the "*Miranda* waivers were issued."

*Trial*

H.N. testified that Defendant was "like a grandfather" to her. She was five years old when her father married Defendant's daughter. H.N. had two half-sisters and two stepsisters. She said that she would go camping with Defendant and they "would go to the store together, [they] would fix things. All good normal things that you do with your grandfather."

In September 2020, H.N. spoke with law enforcement and told them that Defendant had raped her. Concerning the details of the offense, H.N. testified:

So we were camping in the backyard and my two sisters who were there were asleep and I was [lying] beside him. And someone was beside me and someone was beside him on the other side. And he began groping me with my clothes on. I pretended to be asleep and he would, he was touching my breast and then he moved down my anus and clasped my waist just a little bit. He then began to take off my shirt and then my pants as well. And then he put his mouth on my breast as he continued to grope me. And he pulled his pants off and he took my hand and he put it on his penis. And I didn't know what to do, so he kind of moved my hand for me. And he spit on his fingers and then placed them on my vaginal area to [sic] kind of as a lubricant. And then he began shoving his penis inside of me because it wasn't completely hard.

H.N. testified that before inserting his penis into her vagina, Defendant inserted two of his fingers and was "swiveling them around." He then added a third finger. H.N. testified that she was eleven years old at the time and a virgin. She said that she remembered when the offense occurred because it was "right before Easter" in 2012. When asked why she did not report the rape in March of 2012, H.N. replied, "I just didn't know how to. I didn't feel anyone would really listen." H.N. testified that Defendant told her that God would be "really mad" at her if she told anyone what happened. She further testified, "And that we had superpowers and that is why we could feel what we could. God wanted us together and to tell someone would be going against God." After disclosing the rape to Detective Bowman, a "controlled" phone call was placed from H.N. to Defendant and recorded.

On cross-examination, H.N. testified that she decided to disclose the rape after speaking with her biological grandfather at his office. He then suggested that she talk to a counselor, whom she also told what happened. He spoke with detectives after that. H.N. acknowledged that she originally said the rape occurred when she was twelve years old.

Detective Bowman's trial testimony was similar to his testimony at the suppression hearing. He said that H.N. initially told him that she was twelve when the rape occurred but corrected the age to eleven two weeks later. He acknowledged that it is not uncommon for a victim to disclose sexual abuse months or years after the offense occurs. Through Detective Bowman, the State played portions of the recording of the controlled phone call between H.N. and Defendant during which Defendant apologized and said he wished that "it would have been different[.]" When H.N. said she wished she was still a virgin, Defendant replied: "I know." H.N. then asked Defendant if he was sorry for taking her virginity. Defendant replied, "I'm sorry for everything."

Detective Bowman's September 17, 2020 recorded interview was played for the jury. Defendant stated he was unsure if he took H.N.'s virginity but admitted that he had raped her while camping in his backyard because he thought that was what she wanted. At the conclusion of the interview, Defendant also provided a written statement.

*Sentencing*

Courtney Gelinas prepared Defendant's presentence report for the Tennessee Board of Probation and Parole and administered the STRONG-R assessment to Defendant. She spoke with Defendant who said that H.N. was fourteen years old at the time of the offense. "They began getting close to each other and believed he felt loved and then it turned sexual in nature." Ms. Gelinas did not include that statement in the presentence report. She said that Defendant reported past use of marijuana and speed.

On cross-examination, Ms. Gelinas testified that the STRONG-R assessment indicated that Defendant was at a low risk of reoffending. She noted that Defendant's drug use occurred nearly forty years ago when he was in his twenties and he had no prior criminal record. Ms. Gelinas testified that Defendant was employed at Flower's Bakery from 1986 until 2018, and he had been receiving Social Security since 2023.

Detective Bowman testified that as documented during the recorded call, Defendant had used God against H.N. to prevent her from disclosing the sexual abuse. He also recounted that Defendant admitted in his interview that the abuse began "early on" and that it went on for several years. Detective Bowman agreed that Defendant admitted to penetrating H.N. a number of times in addition to penetrating her vaginally with his penis for which he was convicted in this case.

H.N. read her victim impact statement to the court pointing out in part that Defendant had stolen her dreams about marriage, a job, and family and "replaced them with nightmares." She said that Defendant had stolen her confidence, and she hated herself "from time to time." H.N. further said:

- 6 -

I deal with pain, guilt, shame and humiliation that comes with repeatedly being sexually abused by a family member. And a child should never be told that their worth lies in the eyes of the predator and the hurtful, disgusting acts he has partaken.

H.N. told the trial court that Defendant had taken eighteen years of her life and that he began touching her when she was five years and continued abusing her until she was "almost sixteen." She said that Defendant had also hindered her relationship with Christ and caused her to lose her faith, noting that Defendant took her faith and "twisted it into some sick game for [his] pleasure." She further said: "There are days I feel like I'm drowning in guilt and shame, trying to hold my head above the water, looking for a purpose to all the pain." H.N. told the court that "a big part of her pay" from employment had been spent on counseling for the past three years, and the sexual abuse caused her to suffer from post-traumatic stress disorder ("PTSD"), depression, and anxiety.

Defendant gave an allocution stating: "I just want to tell [H.N.] and [H.N.'s] family I'm sorry and forgive me for what I done. And I want to tell my wife and my family I'm sorry and forgive me for what I done."

In determining Defendant's sentence, the trial court considered the evidence received at trial and at the sentencing hearing, the presentence report, and "all the principles of sentencing arguments as to other sentencing alternatives." The court pointed out that Defendant's sentence was subject to mandatory confinement because he was convicted of the Class A felony of rape of a child, with a sentencing range of twenty-five to forty years at one hundred percent service. The trial court also discussed the nature of the offense and found it to be "reprehensible" noting that this type of offense "may possibly be worse than a murder" due to the lasting effects on the victim. The court noted that although Defendant was convicted of one offense in this case, the sexual abuse occurred multiple times and was an ongoing offense.

The trial court applied three enhancement factors: the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim were particularly great; the offense involved a victim and was committed to gratify Defendant's desire for pleasure or excitement; and Defendant abused a position of public or private trust in a manner that significantly facilitated the commission or fulfillment of the offense. T.C.A. § 40-35-114 (6), (7), and (14). The court gave "great weight" to all three factors. The trial court considered Defendant's lack of criminal history as a mitigating factor and did not "give that any weight, given the nature of the charge." The trial court further said:

As I stated, his lack of criminal history, I recognize that he doesn't have that. I recognize his work history. I don't recognize his family history. I appreciate the fact that you've worked your entire adult life. The only problem is that you wasted it all by your actions.

- 7 -

\* \* \*

The only question really that's left is when we look at how long that you serve. You know, I'm not making a ruling on it, but the court can't exist in a vacuum. The court sees how that this is a death penalty eligible offense potentially in the future. That has no bearing on what I'm ruling here today, but it's obvious that this type of offense is beginning to be more reprehensible as we go along. As obviously there were times when this wasn't talked about, when families said, no, it didn't happen, when families said you weren't that hurt, when families said you need to forget about that, when families said I don't believe you. You've believed everything else I've told you in my life, but you don't believe this. And that's exactly what he had during the trial.

I think the deterrence factor of a sentence in this case speaks volumes.

As to enhancement factor (6), the trial court agreed that it gave great weight to H.N.'s testimony that she suffered from extreme PTSD and night terrors. The trial court imposed the maximum sentence for forty years at one hundred percent.

**Analysis**

I.   Denial of Motion to Suppress

Defendant contends that the trial court erred by denying the motion to suppress his statement to police. More specifically, he argues that the statement was made without a knowing and intelligent waiver of his *Miranda* rights.

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Green*, 697 S.W.3d 634, 640 (Tenn. 2024) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* (quoting *Odom*, 928 S.W.2d at 23). However, "the application of the law to the facts is a question of law that appellate courts review de novo with no presumption of correctness." *Id.* (quoting *State v. Bell*, 429 S.W.3d 524, 529 (Tenn. 2014)); *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. McKinney*, 669 S.W.3d 753, 764 (Tenn. 2023) (quoting *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010)).

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution protect against compelled self-incrimination. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 9. In *Miranda v. Arizona*, the United States Supreme Court

established procedural safeguards to secure the Fifth Amendment privilege against self-incrimination. 384 U.S. 436, 444 (1966). To combat the compulsion inherent in a custodial interrogation, the accused must be informed prior to questioning regarding the right to remain silent, that anything he says can be used against him in a court of law, the right to an attorney, and that an attorney will be appointed at no cost prior to questioning upon request. *State v. Climer*, 400 S.W.3d 537, 557 (Tenn. 2013) (citing *Miranda*, 384 U.S. at 479). A defendant may waive his rights under *Miranda* if such waiver is voluntary, knowing, and intelligent. *Echols*, 382 S.W.3d at 280.

The State bears the burden of proving by a preponderance of the evidence that the defendant waived his or her *Miranda* rights. *Climer*, 400 S.W.3d at 564; *see also Missouri v. Seibert*, 542 U.S. 600, 608 n.1, (2004). This burden is satisfied if based on the totality of the circumstances surrounding the interrogation, it shows that the waiver was voluntary in that "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and was knowing in that it was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979); *Colorado v. Spring*, 479 U.S. 564, 573 (1987); *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010); *Climer*, 400 S.W.3d at 564-65.

In this case, the totality of the circumstances demonstrates that Defendant made a knowing and intelligent waiver of his *Miranda* rights. Prior to the interview, Defendant arrived at the sheriff's office to be served with the warrant for an order of protection taken out by H.N. against Defendant and agreed to speak with detectives. Detective Bowman reviewed the waiver of rights form with Defendant "line by line." When Defendant questioned, "When it says, 'I don't want a lawyer at this time,' until I know what it's about . . . ." Detective Bowman explained:

> What that's saying is, that I have read you your rights, and that you understand them. And would you still like to talk to us, or you don't want to talk to us at all? And if you do want to talk to us, then we'll continue with our interview.

Defendant again said, "I just don't know what this is about" but then handed the waiver of rights back to Detective Bowman and said, "I'll speak with you. I don't know what it's about." Defendant did not ask any other questions or express any other concerns about the waiver and signed it. He also initialed the section indicating that he was *Mirandized*, that he could leave, and that he could have legal representation.

Defendant completed high school and had been employed by Flower's Bakery for thirty-two years at the time of the interview. He had no health or mental health problems and had not used drugs or alcohol in twenty-four hours prior to the interview. Defendant claimed he was well-rested and not on any prescription medication. Detective Bowman

had no concerns during the interview that Defendant was under the influence of drugs or alcohol or whether he was mentally unstable. Detective Bowman testified at the suppression hearing that Defendant was not promised any leniency in exchange for his statement.

Thus, the totality of the circumstances demonstrates that the Defendant's *Miranda* waiver was knowing, intelligent, and voluntary. Defendant is not entitled to relief on this issue.

## II.  Sentencing

Defendant argues that the trial court erred by imposing the maximum sentence of forty years for his rape of a child conviction. He asserts that the trial court misapplied two enhancement factors and relied on an unconstitutional statute to impose a sentence in the maximum range. Defendant further contends that the trial court did not make factual findings necessary to impose the fine assessed by the jury. The State contends that the sentence was proper and that Defendant has waived his issue concerning the fine.

On appeal, the party challenging the sentence bears the burden of establishing that the sentence is improper. *State v. Branham*, 501 S.W.3d 577, 595 (Tenn. Crim. App. 2016). This court reviews sentencing decisions under an "abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010) (citing *State v. Jordan*, 325 S.W.3d 1, 38-40 (Tenn. 2010)).

Once a trial court determines the appropriate range of punishment, the trial court must consider: (1) the evidence received at trial and the sentencing hearing; (2) the presentence report; (3) any arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any applicable mitigating and enhancement factors; (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his behalf; and (8) the result of the validated risk and needs assessment contained in the presentence report. T.C.A. § 40-35-210(a), (b). Additionally, the sentence imposed should be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(2), (4).

When adjusting the length of a sentence within the appropriate range, a trial court is guided by, but not bound by, any applicable mitigating and enhancement factors. *State*

*v. Mosley*, No. W2022-01424-CCA-R3-CD, 2024 WL 1406156, at *21 (Tenn. Crim. App. Apr. 2, 2024) (quoting *Bise*, 380 S.W.3d at 706), *perm. app. denied* (Tenn. July 18, 2024). It is within the trial court's sound discretion to weigh any applicable mitigating or enhancement factors. *State v. Nelson*, No. M2023-00176-CCA-R3-CD, 2024 WL 1192985, at *15 (Tenn. Crim. App. Mar. 20, 2024) (quoting *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008)), *no perm. app. filed.* Thus, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed" from the sentencing act. *Bise*, 380 S.W.3d at 706. It is well-settled that "mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal" since the 2005 amendments to the Sentencing Act. *Bise*, 380 S.W.3d at 706; *see State v. Barnes*, No. M2024-00016-CCA-R3-CD, 2025 WL 25896, at *11 (Tenn. Crim. App. Jan. 3, 2025), *perm. app. denied* (Tenn. May 23, 2025).

Here, Defendant's sentence was subject to mandatory confinement because he was convicted of the Class A felony of rape of a child, with a sentencing range of twenty-five to forty years at one hundred percent service. As noted above, the trial court applied three enhancement factors: the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim were particularly great; the offense involved a victim and was committed to gratify Defendant's desire for pleasure or excitement; and Defendant abused a position of public or private trust in a manner that significantly facilitated the commission or fulfillment of the offense. T.C.A. § 40-35-114 (6), (7), and (14). The court gave "great weight" to all three factors. The trial court considered Defendant's lack of criminal history and work history as a mitigating factor and did not "give that any weight, given the nature of the charge."

Defendant contends that the trial court erred in applying and giving great weight to factors (6) and (7). He does not challenge the application of factor (14) or the weight given to that factor, and the record reflects that it was appropriately applied.

As to factor (6), Defendant argues that there was nothing to support that H.N. suffered particularly great injury "aside from H.N.'s victim impact statement." In her victim impact statement, H.N. stated that Defendant had taken eighteen years of her life and hindered her relationship with Christ and caused her to lose her faith, noting that Defendant took her faith and "twisted it into some sick game for [his] pleasure." A large portion of her earnings from employment had been spent on counseling for the past three years, and the sexual abuse caused her to suffer from PTSD, depression, and anxiety. These facts support the trial court's application of factor (6) as there is no requirement that the "injuries be physical, nor does it require expert proof of psychological injury." *State v. Bear*, No. E2008-01498-CCA-R3-CD, 2010 WL 424260, at *20 (Tenn. Crim. App. Feb. 5, 2010) (citing *State v. Arnett*, 49 S.W.3d 250, 260 (Tenn. 2001); *State v. Smith*, 891 S.W.2d 922, 930 (Tenn. Crim. App. 1994)). Application of factor (6) "is appropriate where there is specific and objective evidence demonstrating how the victim's mental injury is

more serious or more severe than that which normally results from this offense. Such proof may be presented by the victim's own testimony[.]" *Arnett*, 49 S.W.3d at 260; *see State v. Cole*, No. W2001-02871-CCA-R3-CD, 2002 WL 31895730, at *5 (Tenn. Crim. App. Dec. 31, 2002).

Defendant challenges the trial court's application of factor (7) arguing that it was not supported by law because that the State "failed to adduce specific, objective evidence of any motive, and there was no proof that [Defendant] achieved climax, made sexually explicit remarks, or engaged in overtly sexual displays indicative of the type of motivation contemplated by this factor." He further argues that he never isolated H.N. or planned anything. "It just happened."

As pointed out by the State, Defendant conceded at the sentencing hearing that this factor applied and did not contest its application. Thus, this issue is waived. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). In any event, the trial court properly applied factor (7). H.N. testified that Defendant groped her outside of her clothing while everyone else was asleep and she pretended to be asleep. He touched her breasts and then moved down to her anus and removed her shirt and pants. Defendant then placed his mouth on her breast as he continued to grope her, and he removed his pants and placed H.N.'s hand on his penis and moved it for her. He then spit on his fingers as a lubricant and initially placed two of them in H.N.'s vagina and "swiveled" them around and then added a third finger. Finally, Defendant penetrated H.N. with his penis. "[F]actor (7) may be applied with evidence including, but not limited to, sexually explicit remarks and overt sexual displays made by the defendant, such as fondling or kissing a victim or otherwise behaving in a sexual manner, or remarks or behavior demonstrating the defendant's enjoyment of the sheer violence of the rape. *Arnett*, 49 S.W.3d at 262. Based on H.N.'s testimony, we can conceive of no other reason that Defendant committed the act in this case other than for pleasure or excitement.

The trial court did not err in applying factors (6) and (7) to Defendant's sentence, and Defendant's disagreement with the weight given to those factors is no longer grounds for an appeal. The trial court did not abuse its discretion in imposing a within-range sentence of forty years. Defendant is not entitled to relief.

Defendant also argues that the trial court erred in considering an unconstitutional statute that was not in effect at the time of the offense. At the sentencing hearing, the trial court noted: "The court sees how that this is a death penalty eligible offense potentially in the future. That has no bearing on what I'm ruling here today, but it's obvious that this type of offense is beginning to be more reprehensible as we go along." The trial court was referring to the current statute for rape of a child that was effective July 1, 2024, and provides that rape of a child is now eligible for punishment by death, imprisonment for life

without the possibility of parole, and imprisonment for life.  T.C.A. § 39-13-522 (2024). However, it is clear from the record that the trial court did not rely on this statute in imposing the length of Defendant's sentence as the court explicitly stated that the current statute had "ha[d] no bearing" on its decision.  Therefore, Defendant is not entitled to relief on this issue.

Finally, Defendant contends that the trial court erred by imposing the $50,000 fine assessed by the jury without making factual findings concerning his ability to pay. However, as argued by the State, this issue is waived because Defendant failed to raise it at the sentencing hearing or in his motion for new trial.  "A trial court does not abuse its discretion by imposing a fine without discussing the defendant's ability to pay when," as here, "the defendant fails to raise the issue at sentencing or in a motion for new trial, and the record lacks proof about the defendant's ability to pay the fines." *State v. Spencer*, No. W2023-01008-CCA-R3-CD, 2024 WL 4902263, at *8 (Tenn. Crim. App. Nov. 27, 2024) *no perm app. filed*; *see State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App 1996). Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

s/*Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE